**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **WILLIAM B. ROBINSON,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:08-cv-00235** |
| | ) | **Chief Judge Sharp** |
| **JIM MORROW, WARDEN** | ) | |
| | ) | |
| **Respondent.** | ) | |

## <u>MEMORANDUM OPINION</u>

Petitioner William Robinson, a prisoner serving a life sentence in state custody, has filed a petition under 28 U.S.C. § 2254 for the writ of habeas corpus (Docket Entry No. 1), which was followed by the appointment of counsel (Docket Entry No. 4) and counsel's filing of an Amended Petition (Docket Entry No. 12), a Second Amended Petition (Docket Entry No. 33), and finally a Third Amended Petition (Docket Entry No. 53). Petitioner has been permitted to conduct discovery (*e.g.*, Docket Entry No. 51), and Respondent has answered the operative petition (Docket Entry No. 58). Presently pending are Petitioner's Motion for Summary Judgment (Docket Entry No. 70) and Motion to Expand the Record (Docket Entry No. 74), and Respondent's Motion for Summary Judgment (Docket Entry No. 87). The motions have been fully briefed and are ripe for decision.

For the reasons set forth below, Petitioner's Motion to Expand the Record (Docket Entry No. 74) will be granted in part, and the attachments to Docket Entry Nos. 66–68 will be accepted into the record before the court, with the exception of Nos. 66-2, 68-1 and 68-6. Petitioner's Motion for Summary Judgment (Docket Entry No. 70) will be

granted with respect to Claims 2 and 5, and denied in all other respects.  Respondent's Motion for Summary Judgment (Docket Entry No. 87) will be granted with respect to claims 1, 3, 4, 6 and 7 and denied with respect to Claims 2 and 5.

## I.    BACKGROUND AND PROCEDURAL HISTORY

Petitioner was convicted in Davidson County Criminal Court on October 31, 2001, of first-degree premeditated murder and was sentenced to life in prison. (Docket Entry No. 23-1, at 40.)  Petitioner's conviction and sentence were affirmed by the Tennessee Court of Criminal Appeals on direct appeal, and the Tennessee Supreme Court denied permission to appeal on November 24, 2003. *State v. Robinson*, No. M2002-00665-CCA-R3-CD, 2003 WL 21653882, at *1–11 (Tenn. Ct. Crim. App. July 11, 2003), *perm. to appeal denied*, (Tenn. Nov. 24, 2003) (Docket Entry Nos. 23-6, 23-9).  Petitioner did not seek certiorari from the United States Supreme Court.

Petitioner filed a pro se petition for post-conviction relief on November 4, 2004 (Docket Entry No. 23-10, at 4), and filed an amended petition through counsel on March 18, 2005. (Docket Entry No. 23-10, at 29.)  The trial court denied relief on March 29, 2005. (Docket Entry No. 23-10, 36–41.)  The Tennessee Court of Criminal Appeals affirmed the denial, and the Tennessee Supreme Court again denied permission to appeal on March 12, 2007. *Robinson v. State*, No. M2005-01122-CCA-R3-PC, 2006 WL 3498140 (Tenn. Ct. Crim. App. Nov. 22, 2006), *perm. to appeal denied*, (Tenn. March 12, 2007) (Docket Entry Nos. 23-16, 23-19.)

Pursuant to the mail-box rule, Petitioner filed his original petition under 28 U.S.C. § 2254 in this court on February 14, 2008. (Docket Entry No. 1, at 14.)  The court has permitted Petitioner to conduct limited discovery under Rule 6(a) of the Rules Governing

§ 2254 Cases. Following a stay to allow for exhaustion of an actual innocence claim that was ultimately withdrawn, the court reopened this case on February 8, 2011. (Docket Entry No. 54.) Petitioner filed the operative Third Amended Petition on January 28, 2011. (Docket Entry No. 53.)

## II.   STATEMENT OF FACTS

The Tennessee Court of Criminal Appeals on direct appeal summarized the facts introduced at trial as follows:

> Lakeisha Green, the victim's daughter, testified that the victim had been previously married, and had gone by the names Sheila Calloway, Sheila Green, Sheila Matlock, and again Sheila Calloway, in that order. Green stated that the last time she saw her mother was around October 20, 2000, approximately three weeks before her mother's death. She testified that she had visited her mother four or five times between June and October of 2000 and that she had stayed in the house that her mother rented at 1528 22nd Avenue North. She reported that she learned of her mother's death on November 10, 2000. She testified that she met the Defendant in mid-September of 2000, and that her mother had been in a relationship with him at that time. She also stated that her mother had been right-handed. On cross-examination, Green acknowledged that her mother had been living at 1901 Murfreesboro Road, Apt. 101. On re-direct, Green affirmed that while her mother was living with the Defendant, she continued to maintain her residence on 22nd Avenue in living condition.
>
> Officer Dan Whitley, a police officer with the Metropolitan Nashville Police Department, testified that he was assigned to South Patrol on November 9, 2000. He stated that on that date, he received a radio dispatch at 11:29 a.m., and he responded to 1901 Murfreesboro Road at 11:32 a.m. He reported that the address was an apartment complex known as the Canterchase Apartments, within Davidson County, and that he went to apartment 101. He stated that he was the first officer to arrive at the scene, and that when he knocked on the apartment door, the Defendant answered within a minute and came out of the apartment. Whitley reported seeing blood on the Defendant's hands and arms. He stated that the Defendant had his arms out and that "he just slowly turned around and put his hands back behind his back and said, "Cuff me. Cuff me." Officer Whitley described the Defendant as appearing very worried and shocked, though he could not tell if the Defendant had been crying. He reported that at the time, the Defendant said, "I messed up," but he made no other

3

statements to him. Officer Whitley later acknowledged that that statement was not in his report, but insisted, "I do recall that he did indeed say that. It's my mistake by not putting it here in my report, but I do vividly recall him saying that." He testified that he asked the Defendant if anyone was hurt inside the apartment, to which the Defendant replied, "She is dead." He reported that he then asked the Defendant whether his own safety was at stake, and the Defendant replied, "No."

Officer Whitley testified that he handcuffed the Defendant, placed him on some steps just outside the apartment door where he could "pretty much" see him, and went inside the apartment. Inside the apartment, he found blood on the carpet, the victim lying on her back in the living room, and a large knife lying next to her body. He acknowledged that the Defendant made no attempt to flee the scene. He testified that, "[t]here was blood in the doorway area on the carpet, there was some on the walls, and there was a large amount of blood there where the victim was laying." He also stated that the Defendant had blood all over his arms and hands and that he had some on his clothing. He reported that the victim's head was propped up by a pillow, and that there were some blankets or towels and some type of breathing machine next to her. He also mentioned the presence of an ironing board. In describing the victim, Whitley stated that "[s]he looked like she was dead and lifeless and discolored; and I took her pulse, and she had no pulse and she had expired."

Whitley testified that paramedics arrived at the scene approximately ten or fifteen minutes after him. He stated that when they arrived they checked the victim for a pulse, found none, and hooked her up to an EKG machine which showed no response. He stated that after the paramedics arrived, he set up command at 11:38 a.m. and requested assistance from Homicide, Identification, and the Domestic Violence Division units. He reported the subsequent arrival of the Identification and Homicide units. Officer Whitley also testified that not long after he had arrived at the scene, Officer Mike Sanders arrived, took the Defendant, and placed him in the backseat of his car.

On cross-examination, Officer Whitley acknowledged that part of his standard procedure was to truly and accurately record in his reports any statements made by defendants or suspects. Although, he denied that it was policy to record all statements, he noted that any statements made by a defendant or a suspect pertaining to a case would be recorded. He testified that the call from the dispatcher was announced as a code 1051, a priority code which denotes a stabbing. He testified that the dispatcher had informed the officers that "the Defendant had called his mother and explained to her that he'd gotten in a fight with his girlfriend and-and that he thought he'd killed her."

Officer Michael Sanders, a police officer of more than 13 years, testified that he also responded to the scene around 11:30 a.m. He stated that when he arrived, the Defendant was either sitting or standing outside the apartment, and Officer Whitley was standing in the doorway to the apartment where he could keep an eye on the Defendant. He reported he was not aware that the Defendant had been left alone outside by Officer Whitley prior to his own arrival. He described the Defendant as appearing upset but did not notice whether or not he was actually crying. He testified that the Defendant was cooperative.

Officer Sanders testified that while he was watching the Defendant, the Defendant began talking, stating, "I did it. I loved her. I was wrong for what I did to her." He stated that the Defendant then asked him if he was going to be charged with murder, to which Officer Sanders replied that he did not know. He further testified, "Suspect stated that he and victim got into a fight and that she, the victim, had cut him; but that he did not have to strike back, a man is supposed to be stronger than that." Sanders reported that the Defendant informed MedCom that the victim had been stabbed approximately one hour before. He testified that shortly thereafter, the Defendant was placed in the backseat of his patrol car. Sanders reported that shortly after being placed in the patrol car, the Defendant again began to talk, stating several times that "he was sorry, and he should not have done it. Suspect asked to have shoes brought out to him and also to see victim one last time." Sanders stated that he told the Defendant he would let the detective know about the Defendant's requests. He reported that after Detective Mike Smith arrived, the Defendant stated that "this would not take much investigation, that he would tell the detective anything that he wanted to know."

Sanders testified that when Detective Smith approached the car to ask Sanders a question, Sanders informed him that the Defendant had not yet been read his Miranda warnings, to which the Defendant blurted out, "I waive Miranda." Sanders stated that the Defendant was then transported to the detectives' offices, where the Defendant told Officer Sanders that the Defendant had stabbed the victim two times. Sanders testified that a tape was made while the Defendant was still in transit; however, he did not believe the tape was audible.

Sanders further testified that the only questions he asked the Defendant pertained to information needed for the booking process. He testified that because he was not sure about the Miranda warnings and because a detective was going to get involved, he followed his usual custom and did not ask any questions pertaining to the incident that led him to respond to the dispatch call.

Detective Brad Corcoran testified that he had been employed by the

Metropolitan Police Department for 15 years and that he had been a detective in the Homicide Section for four years. He stated that prior to his assignment with the Homicide Section, he had worked in the Identification Section as a crime scene investigator for nine years. He explained that as a crime scene investigator, his job had been to bring the scene of a crime to court through photography, diagrams, and physical evidence.

Detective Corcoran testified that when he arrived at the Defendant's apartment on November 9, 2000, the Defendant was already being transported. He stated that he did a walk-through of the crime scene, made an assessment, and canvassed the area to find out if any neighbors heard or saw anything.

Detective Corcoran identified in court a diagram of the crime scene. He stated that the victim's body was still present in the apartment at the time of his walk-through, and that because there were no signs of life, the body was left as it was found to aid the authorities in trying to recreate or determine what had happened. He indicated on the diagram where the body had been found, as well as an antenna, a long blood streak, a butcher knife, a microwave, and various bloodstains. Consistent with the diagram, he testified that the long blood streak was in the living area, with other bloodstains in the kitchen area, in the foyer near the door, around the wall, and close to the victim. He reported that the butcher knife was found just to the left side of the victim on the floor.

Corcoran identified photographs of the victim with the butcher knife lying to the left side of her body. Corcoran also identified photographs of a steak knife found on the kitchen table, the butcher knife found next to the victim's body, bloodstains in the foyer, bloodstains on the carpet leaving the foyer, "cast-off" stains found high on the dining room or living room wall, the view from the living room, the carpet in the living area, the bedroom, the bed and telephone, the kitchen area, including transfer-pattern bloodstains, and the kitchen floor, including a faint transfer bloodstain. Corcoran testified that the steak knife had been found on the corner of the kitchen table in the dining room.

Detective Corcoran explained that "cast-off" stains occur when blood that had been on some type of surface is "actually cast from that object or the body onto another surface." He testified that the "cast-off" stains found on the dining room or living room wall would have resulted from some type of movement, such as moving a person's hand back and forth; however, he did not know if the object that had cast the blood was a hand or one of the knives. Corcoran explained that "transfer patterns" are created when blood is transferred from one object to another through direct physical contact, as opposed to a "cast-off" motion. Corcoran further testified that most of the blood found in the apartment was at the foyer or the front door. He

noted that the apartment did not appear to be in disarray, and that other than the blood, "you couldn't depict this apartment as having a sign of struggle in it." He reported that despite canvassing the area for witnesses, no one, not even the next door neighbor had seen or heard anything.

Officer William Merryman testified that he had been a police officer for twenty-six years, and that he had spent twenty-one of those years with the Metropolitan Police Department, Identification Section. He testified that he assisted in processing the crime scene. He stated that he created a diagram of the crime scene while all the evidence was still in place. He testified that he collected twelve blood samples and a substance sample from the apartment. The blood samples were taken from a kitchen cabinet door, the east wall in the dining room, the wall behind the microwave in the kitchen, the counter top behind the microwave, the counter top near the microwave, the north wall in the living room, the kitchen floor, the floor by the front door, and the inside of the front door. He also testified that he took a sample of a red substance from the bathroom sink. He stated that when he took the blood samples, some were wet but most of them were dry, and that there was no way to tell how long the dry samples had been there.

Officer Raymond Rader, Jr. testified that he had been with the Metropolitan Police Department for twenty-six years and that he had been assigned to the Technical Investigation Section, Identification, for the past fourteen years. He reported that he was the first Identification officer to arrive on the scene and that the Defendant was still there at that point. He noted seeing a considerable amount of blood splatter on the wall, on the door, and on the floor, with the deceased victim lying on the far side of the apartment in the living room. He also collected some evidence himself, including a respirator found near the victim's body.

Detective Mike Smith testified that he had been a police detective for the Metropolitan Police Department, Homicide Division, for seventeen years, and that he had been a police officer for twenty-nine years. He stated that he was assigned as the lead investigator in this case and that he arrived at the scene of the crime just after noon. He stated that he was briefed by two patrol officers, and he then proceeded to review the scene. He reported that the Defendant was still at the scene, and that since the Defendant was willing to speak to him, the Defendant was transported by Officer Sanders to the Criminal Justice Center for a videotaped interview. Detective Smith identified in court the Defendant as the suspect he interviewed.

Detective Smith testified that prior to interviewing the Defendant, he advised him of his constitutional rights under Miranda,1 and that this warning was included on the interview tape. Smith identified the tape at

trial, and it was entered as evidence and played for the jury. During the taped interview the Defendant made reference to some injuries on his arms. Detective Smith testified that he observed these injuries, and described one as a "scratch-type of wound, and the other ... maybe a puncture with some dry blood around it." Photographs of the Defendant in the interview room, including two of his wounds, were admitted into evidence and shown to the jury. One of the photographs depicted the Defendant's right arm, and another depicted his left arm. Smith testified that the wounds were not actively bleeding when he observed them, the Defendant did not seek medical assistance, nor was any given to him.

During the taped interview, the Defendant made a number of incriminating statements, including that the victim had barely "scraped" him and that "she wouldn't hurt [him] in a million years." The Defendant conceded that "it wasn't her fault" and stated that "she didn't do anything to justify what I did." Finally, he stated that after he stabbed the victim in the back, he "could have stopped there."

Detective Smith reported that after the photographs were taken, the Defendant's clothes were sent to the Tennessee Bureau of Investigation (TBI) Crime Lab for examination. He identified the clothes in court, and they were admitted as evidence. He stated that he eventually took all the evidence collected from the apartment, as well as a sample of the Defendant's blood, to the TBI Crime Lab for analysis. He testified that he had also taken a taped statement from the Defendant's mother, Viola Robinson. Detective Smith reported that the Defendant had no apparent physical handicaps when he interviewed him, that he did not use a walker at that time, and that he did not complain of any physical ailments. The detective also stated that he took no statements from the Defendant other than those on the videotape. Detective Smith testified that the first time he saw the Defendant was in the backseat of Officer Sanders' car. He recalled that the Defendant was upset and his voice was whining and trembling. However, he did not recall that the Defendant actually was crying.

John E. Gerber, M.D., testified as an expert in the field of forensic pathology. He explained that a forensic pathologist examines autopsy tissue to determine the cause and manner of death. Dr. Gerber prepared a report of the autopsy which was performed on the victim on November 10, 2000, and it was admitted as evidence. Dr. Gerber testified that delaying the autopsy until the day after the victim's death would not affect the results, as the body was kept in a cooler which minimized any decomposition. Dr. Gerber diagnosed the cause of the victim's death as "multiple stab wounds of the torso or the chest, abdominal area," and stated that "the manner of death was determined to be a homicide." He reported that the body of the victim was five feet, three inches in height

and weighed 155 pounds. He testified that the body had two stab wounds, one in the front left upper chest, and the other in the left upper back. He could not tell which wound had been inflicted first. He testified that the front wound evidenced a five to six inch penetration depth and that it resulted in a fractured left second rib, a lacerated upper lobe of the left lung, a lacerated pericardium, and a superficial penetration of the left side of the heart. He reported that the back wound had a depth of three to four inches, but that it was very superficial, meaning that it ran parallel to the surface of the body. He testified that a significant amount of force would be necessary to penetrate a rib, as was done to the victim through the frontal wound. He testified as to the size of the wounds, and after examining the butcher knife in evidence, he concluded that they were consistent with injuries that would be inflicted by the blade on such a knife. Dr. Gerber testified that the back wound alone would not have been fatal. He stated that the front wound actually killed the victim. He estimated that with those wounds, the victim could have lived for as long as twenty or thirty minutes. Dr. Gerber stated that although he could not testify to a reasonable medical certainty as to how long the victim lived, the fact that she had a collapsed lung and damage to her heart put her at great risk for a fairly sudden death. He also concluded that without urgent and immediate medical attention, the victim's injuries would be fatal.

Margaret Bash testified that she was employed by the Tennessee Bureau of Investigation Crime Laboratory as a forensic scientist, specializing in serology and DNA analysis. Bash testified that the victim's blood was found on the respirator, a piece of carpet, a blanket, a butcher knife found near the victim, and in the blood samples from the front door, the kitchen cabinet door, the east dining room wall, the counter near the microwave, the living room, and the kitchen floor. She stated that she similarly tested a piece of antenna, but did not find blood on it. She also tested the shirt and pants that the Defendant was wearing at the time of his arrest. She found blood matching that of the victim's on the Defendant's shirt. She also found human blood on his pants; however, it contained a mixture of genetic material from more than one person, of which the victim was the primary contributor. She stated that she tested a pillow and found the presence of human blood, but there was not enough blood to complete a DNA analysis or get a profile. Finally, Bash testified that she tested the steak knife, and she found human blood, "and the DNA profile matched [the Defendant], with one locus, D-eighteen-S-fifty-one, inconclusive." However, she maintained that there was no doubt that it was the Defendant's DNA on the steak knife.

The Defendant testified on his own behalf. He gave a synopsis of his background, including three years of college education in criminal justice and work experience as a pre-trial officer, a correctional counselor, and a loss prevention supervisor. The Defendant stated that he had never been

married and that he had one son. He testified that he first had contact with the victim through the Nashville Singles Line and that they had met for the first time at Temple Baptist Church in March 1999. He stated that he had been a minister at a different Church since 1997.

The Defendant testified that he dated the victim from March 1999, until June 2000, at which time they were engaged and the victim moved in with the Defendant at 1901 Murfreesboro Road, Apartment 101. He acknowledged that although the victim lived with him, she continued to maintain her residence at 1528 22nd Avenue because her daughter lived there. He stated that in November 2000, the victim was working at The Men's Warehouse across the street from Rivergate Mall, his own place of employment.

The Defendant testified that the day before the victim's death was a good day, though it ended with an argument between he and the victim about her spending too much money. He stated that there was no violence that night, but they both went to bed upset. The Defendant testified that on the morning of November 9, 2000, the victim woke up first, then he did, around 5:30 a.m. He stated that he and the victim watched television for a while, and then around 8:00 a.m., he and the victim began to argue. He testified,

> "She got upset again, telling me that wasn't no man gonna tell her how to spend her money. And I kept trying to emphasize to her, I wasn't just a man, I'm the man you plan on marry (sic). And we just started swapping words back and forth, how you do-how you do in arguments, so-now it seems so silly."

The Defendant testified that he was scheduled to work that day at 10:00 a.m., and although the victim was not scheduled to work, she had volunteered the day before to go in to work that day. He testified that by the time their fight resumed, she had showered and put on her underclothes, and he had ironed a shirt for her and was working on a second. He recalled, "We got back into the argument, to where we was just swapping words back and forth. And, oh, God, it just grew. It just grew unnecessary." He maintained that prior to that day, they had never had a physical confrontation.

The Defendant indicated that the fight began at the ironing board between the front door and the living room. He testified that when he brought up the subject of money with the victim,

> she went on and said that-again that, "I'm not gonna"-"I'm forty-five years old"-and the word she used was the N-word;

I'm not gonna use it here in court-"gonna tell me how to spend my money." I said again, you know, "You gotta stop"-"you can't talk to me like that. I'm not"-"I'm not just any old"-"any old man. I'm the one you marry." She got mad, and she said, "Stop' b-i-t-c-hing (sic)-I don't wanna say the word"-"at me about money." That's when she went to this table right here [indicated on Exhibit 5] and picked up-everybody keeps-I-it's constantly been called a "butcher knife"; it's a carving knife.... She picked that up and came at me.... She picked it up and then started walking towards me, right here [indicated] towards the ironing board.... I turned to my left, and I-and I says, "What the hell." And I got scratched-she sent the knife across my arms.

The Defendant then rolled up his sleeves to display his scars for the jury. He continued, "She came towards me.... I took my hands up .... and crossed those." He then demonstrated to the jury how she had allegedly cut him while his arms were crossed. The Defendant stated that he first learned there was an injury to the upper part of his arm when he was in the back of Detective Sanders' patrol car. He stated that the photographs showing his injuries were taken right after the injuries happened, and that a year later he still had the scars.

The Defendant testified that the victim cut him, and then he stated, "That's when I reacted, tried to take the knife from her.... I took the knife, pushed it behind her. She's shorter than I am; she was five-three. I didn't know it at the time, but this punctured her back." He reported that the victim held the knife in her right hand. He continued, "And I took my right hand ... and got the knife out, got the knife from her. I spunned (sic) her around, and I pushed her; and that's when I stabbed her." The Defendant testified that he had the knife in his right hand, and demonstrated how he had allegedly pushed the victim. He testified that his going after the knife was an immediate reaction from being cut. The Defendant asserted that he did not intend to stab or harm the victim in any way when he pushed her. He claimed, "Sheila was the love of my life. I didn't want anything to happen to her."

When questioned about his intent to push the victim, the Defendant stated that it was "just to get her back.... Just to get her back away from me." In attempting to explain Dr. Gerber's testimony as to the force used with the wound, the Defendant stated, "I pushed her pretty hard. I'm-I'm a short man, but I'm not exactly a small man. And, when I pushed her, it was-it was with the force to knock somebody down." When asked if he was in fear for his own safety regarding the knife, he replied, "I was-I was shocked and stunned; yeah. Yeah. I didn't know what she was gonna do with it,...." The Defendant testified that the victim had never done anything

like that before. He later stated, "I became enraged, I have to acknowledge, because I couldn't believe she came at me with a knife." The Defendant continued, "Soon as I pushed her back, I saw blood coming from her chest. And I don't curse normally; but, the minute I saw that blood, I said, 'Oh, shit, baby.' "

He explained that he then put his arm around the victim so that she could lean on his left side, and he attempted to walk her to the bedroom to lay her on the bed. The Defendant recalled that the victim did not make it that far, and instead stopped and lay down in the area behind the sectional, in front of the bedroom and bathroom hallway. He stated that he took a pillow off the sofa and pushed it under the victim's head, got a comforter from the bedroom to try to keep her warm, and got towels from the bathroom to apply pressure to the wound. At this point, the Defendant contends that the victim grabbed him behind his head and said, "Sweetie, I'm not gonna make it." While crying, he then described an intimate conversation that ensued between himself and the victim. He claimed, "The last words outta Sheila's mouth was she loved me with all her heart, and she started to making this gargling sound. And she gargled-she was turning her-her body towards what was her left, where I was, and she turned around and blew out.... And she died right there in my arms."

The Defendant estimated that the victim died no more than five to seven minutes after he stabbed her. He testified that after she died, he used his CPAP machine, which was an oxygen machine used for sleep apnea, in an unsuccessful attempt to revive her. He claimed that even after he stabbed the victim, he did not intend for her to die. As a reason for not calling 911, he stated, "She was already dead. When we set-after she set there holding me, talking to me, I wasn't thinking about anything but listening to my-to my love. And, as she died-and she died in my arms. Then, like I said, all I did was cry and hold her in-her body in my arms." He estimated that he held her for around fifteen to twenty minutes after she died.

The Defendant testified that he then called his mother and told her what had happened. He claimed that they prayed together and that she said she was going to call 911. He testified that he made no attempt to flee the scene, clean it up, or move any evidence, because he did not deny that he stabbed the Defendant; however, he testified that he did not intend to stab her. He also testified that he telephoned Brenda McKinney, a friend of his in Memphis, after talking to his mother. As his purpose for that phone call he stated, "Just the last conversation before I died." However, McKinney was apparently at work with clients and told him she would call him back. The Defendant testified that his mother called him back to notify him that she had called 911. The police arrived within a minute of that call.

The Defendant recounted the sequence of events that happened beginning with the arrival of Officer Whitley, essentially confirming the officers' testimony. He confirmed his instruction to Officer Whitley to "cuff" him, and he acknowledged that he told Whitley, "I have just stabbed my fiancé. She's inside." The Defendant testified regarding the conversation in which he assured Officer Whitley that his safety was not at stake. He claimed to have been in tears while sitting on the steps and in the back of the patrol car. The Defendant stated that the officers denied his request to see the victim one more time. He claims that while pulling away in the patrol car, he yelled out of the car, "Bye, baby. Bye, baby. Bye, baby" and that he "was completely, for lack of a better word, insane."

The Defendant acknowledged that he gave a videotaped statement to Officer Williams and Detective Smith. At trial he referred to his taped statements regarding the cuts the victim allegedly inflicted on him. However, he insisted that he "wasn't even thinking 'bout the cuts. And I was just thinking about, you know, after I laid her down and saw that she was cut on her back, I just thinking 'bout what if I'd a just got the knife and just threw it down." Yet, he again insisted that he did not intend to stab or kill the victim. He testified that he did not take the time to look at any of his own wounds. Regarding the steak knife found on the kitchen table, the Defendant insisted that it was in no way involved in the altercation, and that it was just used to scrape material off of their iron. He had no explanation for how his blood got on it. He testified that Detective Smith took him to General Hospital and had two tubes of blood extracted from him.

The Defendant described the victim as being temperamental. He claimed to have learned in his time with her that either waking her up or criticizing her about money would trigger her temper. "I know she was really angry this time, I mean, before-beyond anything that we'd ever had before, you know." In his videotaped statement, he stated, "This wasn't her fault. After she got through complaining about money, I sat there and started talking. I may have drove her off the edge." When asked in cross-examination about this statement, the Defendant explained that he said to the victim, "If we're gonna stay together, we're gonna live like a couple, in my opinion, should." He testified that he told the victim that they would not spend any more money without each other. The Defendant claimed that he and the victim were trying to get the victim moved out of her separate residence at the time of her death. However, he admitted that the victim had her own job, her own money, and her own checking account. He denied having money problems of his own, and he denied discussing a new loan with Brenda McKinney earlier on the morning of the stabbing. The Defendant admitted that he had borrowed money from McKinney, and that he had asked neighbors for money.

Although the Defendant used a walker at his trial, purportedly for pericarditis which made his muscles weak, he acknowledged that he did not have that condition at the time of the stabbing. He testified that he worked out at a gym and that he had a muscular build at the time of the offense. He also testified that as part of his training for correctional facilities and security jobs, he was trained in self-defense and pressure point control tactics and that he had been trained in the use of a firearm and hand-to-hand combat while in the United States Army. The Defendant stated that he weighed 195 pounds and was three inches taller than the victim at the time of her death. He acknowledged that he had also had training in counseling others on domestic violence issues, but denied having such a problem himself. He reiterated that he had not received medical treatment for the cuts on his arms.

When questioned about the issue of self-defense and whether he thought the victim was getting ready to kill him, the Defendant stated, "I thought Ms.-I saw Ms. Calloway coming at me with a knife. I didn't know what the next thing-what-what was gonna come up afterwards." When asked why the butcher knife was found by the victim's body and not near the place where he had initially stabbed her, the Defendant explained, "The knife went inside ... inside her body about five or six inches. It was inside of her.... I took it out, after she's stabbed; and I had it in my hand, as I was walking her over." He stated that he took the knife out almost immediately after stabbing her. He stated that he had received basic first aid training through his prior work experience. The Defendant testified, "I did what I was trained to do, which was to take the towels and put-try to put-apply pressure on the wound." He stated, "You don't think about training, when the person you love has just been stabbed," in explanation of why he attempted to walk the victim to the bedroom despite her heavy bleeding. The Defendant testified that he was sure that the victim was dead before he attempted to revive her with the oxygen machine. He stated that he attempted to take her pulse but found none.

The Defendant admitted that he did not work during the time that the victim took a three-week leave of absence, but he maintained that he was still being paid during that time. The Defendant testified that it really was just a comment about working together on money issues that had caused the victim to go after him with a knife.

Viola Robinson, the Defendant's mother, testified that the Defendant called her on November 9, 2000 screaming, yelling, and crying. She stated that when she asked him where the victim was, he replied, "Her body is here.... Mama, I've killed [the victim].... She cut me, but it wasn't very bad." Robinson recalled that he then started screaming again. She testified that the Defendnat told her that he had not called 911 and that he stated, "I wanted to see you and Pop, before they take me away." She

stated that she told him to hang up and that she was going to call 911. She reported that after she had made the 911 call, she called her son back, told him she had called 911, and prayed with him. She estimated that he first called her between 11:00 and 12:00 p.m., eastern time. She said they had not spoken for long.

In describing the Defendant's general demeanor, Robinson noted that he was normally a mild, easy-going person, but during the phone call on November 9, 2000 he was screaming and yelling. She claimed that "he would make some rational statements and some that didn't seem to make too much sense," and said she had never seen him that upset.

Robinson asserted that she did not know very much about the relationship between the Defendant and the victim, other than that they were engaged and that she had met the victim twice. She stated that she met Brenda McKinney, and had had many more visits and conversations with McKinney than she had had with the victim. However, she testified that she did not form the opinion that the Defendant ever loved McKinney. Rather, she believed that the Defendant loved the victim.

*State v. Robinson*, No. M2002-00665-CCA-R3-CD, 2003 WL 21653882, at *1–11

(Tenn. Ct. Crim. App. July 11, 2003).


## III.    ISSUES PRESENTED FOR REVIEW

In his Third Amended Petition, Petitioner asserts the following claims for relief:

1. The evidence was insufficient to show the mens rea required for first-degree murder.

2. The State violated the Due Process Clause by failing to disclose exculpatory evidence, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) and *Kyles v. Whitley*, 514 U.S. 419 (1995).

3. Trial counsel provided ineffective assistance as follows:

a)    by failing to independently examine, test and otherwise investigate, personally and/or with the assistance of an expert: (1) the physical evidence sent to the Tennessee Bureau of Investigation ("TBI") crime laboratory; and/or (2) the underlying data, reports and conclusions of the TBI and State with respect to that physical evidence;

b)      by failing to challenge the way the prosecutor presented and argued the forensic evidence (i.e. the material addressed by the serology report) to the jury;

c)      by failing to seek and/or present expert medical testimony regarding how long one reasonably could have expected Sheila Calloway to have lived after being wounded;

d)      by failing to review and/or use at trial the allegedly inaudible recording made of Robinson at the scene as he was talking and crying;

e)      by failing to use Detective Mike Smith's preliminary hearing testimony to cross-examine Smith at trial for the purpose of impeaching his testimony indicating Robinson was not crying at the scene;

f)      by failing to seek a "theory of defense" or an otherwise specially tailored jury instruction that would have informed the jurors that, under applicable caselaw, they were prohibited from assuming or speculating as to premeditation merely because Robinson caused multiple knife wounds;

g)      by failing to object to improper closing arguments made by the prosecutor which distorted the evidence.

4. Appellate counsel provided ineffective assistance of counsel by failing to challenge on appeal the trial court's refusal to admit the victim's journal into evidence.

5. The prosecutor violated Robinson's due process rights by giving a misleading and inaccurate presentation of the forensic evidence.

6. The prosecutor violated Robinson's due process rights by asking the jury to convict Robinson of first-degree murder even though precedent foreclosed that theory.

7. This claim incorporates by reference all claims set forth in the original petition that are not expressly restated in the Third Amended Petition, which the court construes to be the following:

a)      Trial and appellate counsel were ineffective in failing to preserve the record with respect to issues litigated at trial but not perfected on appeal;

b)      Appellate counsel on direct appeal and post-conviction appeal were ineffective for failing to communicate with Petitioner about raising appropriate issues;

c)      Trial and appellate counsel were ineffective in failing to inform Petitioner of all possible defenses;

d)     Trial counsel was ineffective for failing to move to suppress inconclusive blood evidence and failing to move to dismiss the indictment due to perjured testimony;

e)     Trial counsel was ineffective for failing to investigate mitigating evidence about Petitioner's background.

## IV.     STANDARD OF REVIEW

### A.     AEDPA Review on the Merits

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S .C. § 2254(a).   Upon finding a constitutional error on habeas corpus review, a federal court may only grant relief if it finds that the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Peterson v. Warren*, 311 F. App'x 798, 803–04 (6th Cir. 2009).

AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases . . . and 'to further the principles of comity, finality, and federalism.'" *Woodford*, 538 U.S. at 206 (quoting *Williams v. Taylor*, 529 U.S. 362, 436 (2000)). The requirements of AEDPA "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." *Uttecht v. Brown*, 551 U.S. 1, 10 (2007 (citations omitted). As the Supreme Court has explained, AEDPA's requirements reflect "the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,'

not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)). Where state courts have ruled on a claim, AEDPA imposes "a substantially higher threshold" for obtaining relief than a de novo review of whether the state court's determination was incorrect. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).   Specifically, a federal court may not grant habeas relief for on a claim rejected on the merits in state court unless the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.   § 2254(d)(1) and (d)(2).   The standard set forth in 28 U.S.C. § 2254(d) for granting relief on a claim rejected on the merits by a state court "is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 563 U.S. 170, —, 131 S. Ct. 1388, 1398 (2011) (quoting *Harrington*, 562 U.S. at 102, and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). The petitioner carries the burden of proof. *Pinholster*, 131 S. Ct. at 1398.

By its express terms, Section 2254(d)'s constrained standard of review only applies to claims that were "adjudicated on the merits" in the state court proceeding, including instances where the state court rules against the petitioner in a summary opinion that rejects all claims without discussion, or an opinion that addresses some claims but does not expressly address all the federal claims presented. *Johnson v.*

*Williams*, 133 S. Ct. 1088, 1096 (2013); *Harrington v. Richter*, 562 U.S. at 98–99; *Clinkscale v. Carter*, 375 F.3d 430, 436 (6th Cir. 2004). Where a claim has not been adjudicated on the merits in state court but is still subject to federal review despite the bars of exhaustion and default, "federal habeas review is not subject to the deferential standard that applies under AEDPA. . . . Instead, the claim is reviewed *de novo.*" *Moritz v. Lafler*, 525 F. App'x 277, 282 (6th Cir. 2013) (quoting *Cone v. Bell*, 556 U.S. 449, 472 (2009)); *accord Bies v. Sheldon*, 775 F.3d 386, 395–96 (6th Cir. 2014) ("Because Bies' *Brady* claim was never 'adjudicated on the merits in State court proceedings,' the limitations imposed by § 2254(d) do not apply, and we review the claim de novo.").

## B.     Exhaustion and Procedural Default

### 1.     *Exhaustion*

28 U.S.C. §§ 2254(b) and (c) provide that a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has presented the same claim sought to be redressed in a federal habeas court to the state courts. *Cullen v. Pinholster*, 563 U.S. at —,131 S. Ct. at 1398. The petitioner must "fairly present"[1] each claim at all levels of state court review, up to and including the state's highest court on discretionary review, *Baldwin v. Reese*, 541 U.S. 27, 29 (2004), except where the state has explicitly disavowed state supreme court review as an available state remedy. *O'Sullivan v. Boerckel*, 526 U.S. 838, 847–48 (1999). Tennessee Supreme Court Rule 39 eliminated the need to seek review in that court in

---

[1] For a claim to be exhausted, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) (internal citation omitted). Nor is it enough to make a general appeal to a broad constitutional guarantee. *Gray v. Netherland*, 518 U.S. 152, 163 (1996).

order to "be deemed to have exhausted all available state remedies." *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003), *cert. denied*, 541 U.S. 956 (2004); *see also Smith v. Morgan*, 371 F. App'x 575, 579 (6th Cir. 2010) ("*Adams* not only requires the federal courts to ensure that the state courts have the first opportunity to review and evaluate legal claims ... but also mandates that the federal courts respect the duly-promulgated rule of the Tennessee Supreme Court that recognizes the law and policy-making function of that court and the court's desire not to be entangled in the business of simple error correction").

This rule has been interpreted by the Supreme Court as one of total exhaustion. *Rose v. Lundy*, 455 U.S. 509 (1982). Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. *Picard v. Connor*, 404 U.S. 270 (1971); *see also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review"). Moreover, the substance of the claim must have been presented as a federal constitutional claim. *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996). Fair presentation requires that the state courts be given the opportunity to see both the factual and legal basis for each claim. *Wagner v. Smith*, 581 F.3d 410, 414 (6th Cir. 2009). For the claim to be exhausted, it must be presented to the state courts as a federal constitutional issue, not merely as an issue arising under state law. *Koontz v. Glossa*, 731 F.2d 365, 369 (6th Cir. 1984). Specifically, in determining whether a petitioner "fairly presented" a federal constitutional claim to the state courts, federal courts should consider whether the petitioner: (1) phrased the federal claim in terms of the pertinent constitutional law or in terms sufficiently particular

to allege a denial of the specific constitutional right in question; (2) relied upon federal cases employing the constitutional analysis in question; 3) relied upon state cases employing the federal constitutional analysis in question; or (4) alleged "facts well within the mainstream of [the pertinent] constitutional law." *Hicks v. Straub*, 377 F.3d 538, 553 (6th Cir. 2004) (quoting *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)). Moreover, the claim must be presented to the state courts under the same legal theory in which it is later presented in federal court. *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998). It cannot rest on a legal theory that is separate and distinct from the one previously considered and rejected in state court. *Id.* This does not mean that the applicant must recite "chapter and verse" of constitutional law, but the applicant is required to make a specific showing of the alleged claim. *Wagner*, 581 F.3d at 414.

### 2.    *Procedural Default*

The procedural default doctrine is ancillary to the exhaustion requirement. *See Edwards v. Carpenter*, 529 U.S. 446 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. *Wainwright v. Sykes*, 433 U.S. 72, 81–82 (1977); *see also Walker v. Martin*, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support

the judgment"); *Coleman v. Thompson*, 501 U.S. 722 (1991) (same).[2]  If a claim has never been presented to the state courts, but a state court remedy is no longer available (e.g., when an applicable statute of limitations bars a claim), then the claim is technically exhausted, but procedurally barred. *Coleman*, 501 U.S. at 731–32; *see also Hicks v. Straub*, 377 F.3d 538, 551 (6th Cir. 2004) (the procedural default doctrine prevents circumvention of the exhaustion doctrine), *cert. denied*, 544 U.S. 928 (2005).[3]

If a claim is procedurally defaulted, "federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.  The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (citing *Coleman*, 501 U.S. at 754).

A petitioner can establish cause in two ways. First, a petitioner may "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *see also Coleman*, 501 U.S. at 753; *Maples v. Stegall*, 340 F.3d 433, 438 (6th Cir. 2003).

---

[2] "The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits." *Walker*, 562 U.S. at 315.  A state rule is an "adequate" procedural ground if it is "firmly established and regularly followed." *Id.* (quoting *Beard v. Kindler*, 558 U.S. 53, 60–61 (2009)). "A discretionary state procedural rule ... can serve as an adequate ground to bar federal habeas review ... even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." *Id.* at 1128 (quoting *Kindler*, 558 U.S. at 60–61) (internal citations & quotation marks omitted).

[3] To avoid procedural default, federal law requires a federal habeas petitioner in Tennessee to present his federal claims to the Tennessee Court of Criminal Appeals. *Covington v. Mills*, 110 F. App'x 663, 666 (6th Cir. 2004).

Objective impediments include an unavailable claim or interference by officials that made compliance impracticable. *Murray*, 477 U.S. at 488. Second, constitutionally ineffective assistance of counsel may constitute cause under certain circumstances. *Murray*, 477 U.S. at 488–89; *Broom v. Mitchell*, 441 F.3d 392, 401 (6th Cir. 2006); *Rust*, 17 F.3d at 161. In Tennessee, the ineffective assistance of post-conviction counsel can, under limited circumstances, establish cause for the default of a claim of ineffective assistance of trial counsel. *Martinez v. Ryan*, --- U.S. ----, 132 S. Ct. 1309, 1320 (2012); *Sutton v. Carpenter*, 745 F.3d 787 (6th Cir. 2014).

A petitioner seeking to overcome procedural default must establish prejudice as well as cause. To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)); *see also Ambrose v. Booker*, 684 F.3d 638, 649 (6th Cir. 2012) (finding that "having shown cause, petitioners must show actual prejudice to excuse their default"). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000). Likewise, if a petitioner cannot establish prejudice, the question of cause is immaterial.

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (citing *Murray*, 477 U.S. at 495–96);

*accord Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006). In the capital-sentencing context, this exception applies to cases in which the petitioner can show "'by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law.'" *Dretke*, 541 U.S. at 392 (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)).

### C.    Summary Judgment Standard

It is well established that a motion for summary judgment, as provided in Rule 56 of the Federal Rules of Civil Procedure, is applicable to habeas corpus proceedings and allows the court to assess the need for an evidentiary hearing on the merits of the habeas petition. *See Blackledge v. Allison*, 431 U.S. 63, 80–81 (1977). Rule 56 of the Federal Rules of Civil Procedure provides in pertinent part that "[t]he court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "There is no genuine issue of material fact when no reasonable jury could return a verdict for the nonmoving party." *Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co.*, 598 F.3d 257, 264 (6th Cir. 2010) (internal quotation marks omitted) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Once the moving party has satisfied its burden, the nonmoving party bears the burden to show that the record reflects a genuine issue of material fact." *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986)). "The district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Am. Civil Liberties Union of Ky. v. Grayson Cnty., Ky.*, 591 F.3d 837, 843 (6th Cir. 2010) (citing *Matsushita*, 475 U.S. at 587). "Entry of summary judgment is appropriate against a party who fails to

make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)) (internal quotation marks omitted).

## V. ANALYSIS AND DISCUSSION

### A. Timeliness of the Petition

Before the court can look to the merits or even the procedural viability of Petitioner's claims, it must resolve a dispute between the parties about the timeliness of the petition. Respondent asserts that Petitioner's original petition was untimely under AEDPA's one-year limitations period for habeas petitions brought by prisoners challenging state-court convictions. Under that provision, the limitations period runs from the latest of four enumerated events:

> (A)　the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

> (B)　the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

> (C)　the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

> (D)　the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1). The limitations period is tolled during the time that "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." *Id.* § 2244(d)(2).

Petitioner's judgment became final on February 23, 2004,[4] the date on which his 90-day window to seek certiorari from the United States Supreme Court expired after the Tennessee Supreme Court's rejection of his direct appeal on November 24, 2003. 255 days passed from that date until Petitioner tolled the AEDPA limitations period by filing his state post-conviction petition on November 4, 2004. Petitioner's post-conviction action concluded when the Tennessee Supreme Court denied review on March 12, 2007, and his AEDPA limitations period expired on July 2, 2007.[5] Because Petitioner's original petition in this action was not dated until more than 7 months later, on February 14, 2008, Respondent asserts that the entire action is time-barred.

Petitioner concedes that "he was a few months late filing his federal petition." (Docket Entry No. 116, at 2.) His response to Respondent's timeliness argument is that he is "actually innocent" of premeditated first-degree murder, and therefore overcomes the statute of limitations bar because it would be "a miscarriage of justice to let his life sentence, which was procured in violation of *Jackson* [*v. Virginia*, 443 U.S. 307 (1979)], stand." (Docket Entry No. 116, at 2.)

The United States Supreme Court has held that "[t]o invoke the miscarriage of justice exception to AEDPA's statute of limitations, . . . a petitioner 'must show that it is more likely than not that no reasonable juror would have convicted him in the light of the

---

[4] The 90th day fell on February 22, 2004, which was a Sunday; accordingly, Petitioner's deadline was the following Monday, which was February 23.

[5] The 365th day of the limitations period fell on a weekend, so Petitioner's deadline was the following Monday.

new evidence.'" *McQuiggin v. Perkins*, — U.S. —, 133 S. Ct. 1924, 1935 (2013) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).    The Supreme Court has incorporated into the limitations-bar context the standard set forth in *Schlup v. Delo*, in which it held that a habeas corpus petitioner should be permitted to argue the merits of defaulted underlying claims where he "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *Schlup*, 513 U.S. at 316.   The threshold inquiry is whether "new facts raised sufficient doubt about [Petitioner's] guilt to undermine the confidence in the result of the trial." *Id.* at 317; *accord Reeves v. Fortner*, 490 F. App'x 766, 769 (6th Cir. 2012).    "While *Schlup* does not require 'absolute certainty' about the innocence of a party in order to establish a credible claim of actual innocence, it is a 'demanding' standard and 'permits review only in the extraordinary case.'" *Reeves*, 490 F. App'x at 769 (quoting *House v. Bell*, 547 U.S. 518, 538 (2006)). "The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *House*, 547 U.S. at 538.   The gateway test has been found satisfied where, for example, new evidence called into question the "central forensic proof" against the petitioner and substantial evidence pointed to a different suspect, *see House*, 547 U.S. at 554, and where new evidence showed a bottle of pills linking petitioner to the crime was not likely to have caused the fatal injury. *Souter v. Jones*, 395 F.3d 577, 597 (6th Cir. 2005).

It is significant to the current dispute that actual innocence in this context "means **factual innocence**, not mere legal insufficiency." *Bousley v. United States*, 523 U.S.

614, 623 (1998) (emphasis added). Accordingly, Petitioner's argument that "the evidence failed to show premeditation" (Docket Entry No. 116, at 2–3), which goes to the *sufficiency* of the evidence to convict him, does not support actual-innocence tolling of the statute of limitations. In fact, nothing about the evidence at trial constitutes new evidence as required to support an actual innocence claim in this context. *See Holloway v. Jones*, 166 F. Supp. 2d 1185, 1191–92 (E.D. Mich. 2001) (rejecting claim of actual innocence for limitations purposes where petitioner's claim relied "solely upon the evidence presented at trial, including his testimony that he shot the victim in self-defense").

This does not end the court's actual innocence analysis, because Petitioner has also asserted that new evidence supports his claim that the victim attacked him before he stabbed her, and that he therefore acted in quasi-self-defense rather than with the premeditation required for first-degree murder. However, the Sixth Circuit has held that a petitioner's claim that he killed in self-defense asserts only legal, as opposed to factual, innocence. *Harvey v. Jones*, 179 F. App'x 294, 298–99 (6th Cir. 2006). In a case on which the Sixth Circuit relied for that conclusion, the Tenth Circuit explained that a claim of self-defense does not amount to actual innocence:

> Nor can Mr. Beavers demonstrate that a fundamental miscarriage of justice would occur if his claim is procedurally barred. To meet this test, a criminal defendant must make a colorable showing of factual innocence. *See Herrera v. Collins*, 506 U.S. 390, 404 (1993). "The exception is intended for those rare situations 'where the State has convicted the wrong person of the crime... [or where] it is evident that the law has made a mistake.'" *Klein v. Neal*, 45 F.3d 1395, 1400 (10th Cir.1995) (citation omitted). Mr. Beavers does not claim that he is innocent of killing Raymond Matthews. Rather, he claims that he is not guilty of first degree murder because he was intoxicated and acted in self defense. However, these arguments go to legal innocence, as opposed to factual innocence.

*Beavers v. Saffle*, 216 F.3d 918, 923 (10th Cir. 2000).

Similarly, several courts have found that a petitioner does not establish actual innocence by asserting that new evidence shows he is guilty only of a lesser degree of homicide:

> [T]he narrow and extraordinary nature of *Schlup*'s actual innocence "gateway" does not extend to petitioners, like Rozzelle, who did the killing and whose alleged "actual innocence" of a non-capital homicide conviction is premised on being guilty of only a lesser degree of homicide.

*Rozzelle v. Sec'y, Florida Dep't of Corr.*, 672 F.3d 1000, 1015 (11th Cir. 2012).

> [E]ven if the new evidence negated a reasonable jury's finding of intent to kill, Petitioner's actual innocence claim fails. In order for barred claims to pass through "*Schlup*'s gateway," Petitioner must establish his factual innocence of the crime, and not mere legal insufficiency. *See Bousley v. United States*, 523 U.S. 614, 623 (1998); *Jaramillo v. Stewart*, 340 F.3d 877, 882–83 (9th Cir. 2003). Even if Petitioner could convince a jury that he lacked the intent to kill, it does not prove his factual innocence, instead it just reduces Petitioner's level of culpability. If Petitioner lacked the intent to kill, it is most likely that firing shots at the car would have been done with reckless indifference and Petitioner would be guilty of a lesser included offense such as manslaughter. The *Schlup* miscarriage of justice exception to the statute of limitations requires factual innocence, and Petitioner's lesser showing of culpability is not adequate grounds for allowing Petitioner to pass through the gateway.

*Guizar v. Gipson*, No. 1:11-CV-00962, 2012 WL 2958248, at *17 (E.D. Cal. July 19, 2012). The Sixth Circuit has not opined on this exact question, but at least one district court within the Sixth Circuit has followed the Eleventh Circuit's decision in *Rozelle* to hold that new facts relevant to the petitioner's state of mind when he admittedly killed the victim cannot establish gateway actual innocence:

> Nor can petitioner establish actual innocence on the basis that Dr. Galdi's opinion that he suffered from marijuana psychosis renders him actually innocent of first degree murder, and guilty of only second degree murder, because it would negate the specific intent elements of first degree murder. This is not the type of evidence of factual innocence that would render it a miscarriage of justice to fail to address petitioner's procedurally

barred claims on the merits. Illustrative is the Eleventh Circuit's decision in *Rozzelle v. Secretary, Fla. Dep't of Corrections*, 672 F.3d 1000 (11th Cir. 2012). . . . [A] petitioner's "individual interest in reducing his . . . conviction to a lesser included . . . conviction does not make the AEDPA unconstitutional nor does it outweigh 'the societal interests in finality, comity, and conservation of scarce judicial resources' that AEDPA's one-year limitation period [as well as the procedural default doctrine] protects." *Id.* (quoting *Schlup*, 513 U.S. at 324). Although the Sixth Circuit has not yet addressed this issue, the Eleventh Circuit's reasoning is persuasive. Further, other courts that have considered the issue have likewise concluded that newly discovered evidence that would merely lower the degree of offense does not establish an actual innocence claim. *See Black v. Workman*, 682 F.3d 880, 915 (10th Cir. 2010); *Sanchez v. Lee*, No. 10 Civ. 7719, 2011 WL 924859, at *36 (Mar. 16, 2011), magistrate judge's report adopted, 2011 WL 3477314 (S.D.N.Y. Aug.8, 2011), *aff'd*, 508 Fed. Appx. 46 (2d Cir. 2013); *Clark v. Martel*, No. S–08–2949, 2009 WL 3489410, at *5 (E.D. Cal. Oct. 26, 2009), *aff'd*, 451 F. App'x. 695 (9th Cir. 2011); *Fishell v. Jones*, No. 1:06CV9, 2009 WL 160796, at * 11 (W.D. Mich. Jan. 22, 2009). Because Dr. Galdi's new opinion would at best simply lower his offense from first to second degree murder, failure to address the merits of petitioner's defaulted claims would not result in a fundamental miscarriage of justice.

*Artz v. Burton*, No. 5:06-CV-10238, 2014 WL 3440078, at *18-19 (E.D. Mich. Feb. 18, 2014) report and recommendation adopted, No. 06-10238, 2014 WL 3451410 (E.D. Mich. July 15, 2014).

The court agrees with the reasoning of the cases quoted above and concludes that by asserting that he is guilty of something less than premeditated first-degree murder, Petitioner has failed to satisfy the standard for gateway actual innocence. Accordingly, the petition in this matter is barred as untimely to the extent that it raises claims based on circumstances that were known at the time Petitioner's judgment became final. Respondent's Motion for Summary Judgment will therefore be granted with respect to Petitioner's Claims 1, 3(c)–(f), 4, 6 and 7. Only the claims and portions of claims that arise from facts learned through discovery in this action are addressed below.

**B.   Newly Discovered Claims**

**1.  *Claim 2 – Brady Claims***

**a.  Relevant Facts and Background**

Petitioner claims that the prosecution withheld material exculpatory evidence in connection with the DNA testing conducted on the knife used to kill the victim, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).   Specifically, Petitioner complains that the prosecution withheld evidence establishing that "the TBI's test of the butcher knife was, for all practical purposes, meaningless," by failing to reveal that it had only tested a single spot on the knife, far from the cutting edge and near the handle. (Docket Entry No. 53, at 28.)   According to Petitioner, if that fact had been disclosed, the prosecution would not have been able to cite the test results as proof that Petitioner's blood was not on the knife and that, ergo, Petitioner's statement to police and trial testimony that the victim had cut him with the knife were false. (*Id.* at 28–29.)   Moreover, Petitioner asserts that the true facts about the DNA testing performed by the state would have led defense counsel to conduct additional testing, which would have proven that Petitioner's blood was in fact on the cutting edge of the knife and would have corroborated his testimony about having been attacked by the victim. (*Id.* at 29.)

When the prosecution sent the butcher knife, which was known to be the weapon with which the victim was stabbed, to the TBI for DNA analysis, it did not provide any special guidance regarding the need to confirm or rule out the presence of Petitioner's blood on the knife.   The prosecutor was aware that under normal circumstances, the TBI wants to minimize DNA testing and might stop testing once it has identified the victim's blood on a piece of evidence, and that she would need to instruct them to do

more testing if the goal was to find out whether the defendant's blood was present. (Docket Entry No. 66-3, at 23–24.)  Specifically, she was aware that the TBI might stop after testing a single spot on a piece of evidence if "they find what they're looking for," which would be determined by the referral paperwork. (*Id.* at 24.)

In this case, the detective's TBI Request for Examination of the butcher knife did not provide any particular instructions, and the prosecutor's letter generically requested "DNA analysis." (*Id.* at 99, 104.)  No one ever informed TBI Agent Margaret Bash that the purpose of the testing was to determine whether Petitioner's blood was on the butcher knife. (Docket Entry No. 67-1, at 128–29.)  Had she been informed that that was the purpose of the testing, or even that more than one person at the scene of the killing was bleeding, she would have tested multiple areas on the knife. (*Id.* at 130.)  In the absence of that instruction, Agent Bash assumed that the purpose of the testing was to determine whether the butcher knife was used to stab the victim. (Docket Entry No. 67-1, at 109.)  She therefore collected DNA from only one spot on the knife – away from the cutting edge, near the handle (Docket Entry No. 67-1, at 105–07) – and determined that it matched the victim.  The Agent recorded her findings in two documents: an official typewritten report indicating in relevant part that the blood on the knife matched the victim (Docket Entry No. 67-2, at 101, 104), and a handwritten analysis that reflected in pertinent part that the single "area worked" on the butcher knife was opposite the cutting edge and closer to the handle than the tip of the knife. (ECF No. 67-2, at 85.)  The prosecution disclosed to the defense only the official typewritten report.

The defense was not provided with the handwritten report showing the limited nature of testing done on the butcher knife, despite a discovery request from defense

counsel expressly asking for any reports of scientific tests or experiments material to the preparation of a defense (Docket Entry No. 68-3, at 3); all material known to the prosecution team that was exculpatory or may lead to exculpatory material, including the reports of any investigations carried out by the TBI (*id.*); any such evidence or information that would tend to lessen the degree of Petitioner's guilt or mitigate his punishment (*id.*); any such evidence that is favorable in that it is exculpatory, would tend to reduce the degree of offense or punishment, or might be used to impeach the credibility of any government witness (*id.* at 5); any memoranda or reports "which might fairly be said to contradict or be inconsistent with any evidence which the State intends to adduce in this matter" (*id.* at 6); and "[a]ny documentary evidence in the possession of the State which contradicts or is inconsistent with any testimony the State intends to introduce in this cause" (*id.*). The state's discovery response stated that there was no exculpatory material to provide, and that "counsel may assume that any specific request which is not answered is either not discoverable or the information requested is not available." (Docket Entry No. 68-5, at 1–2.)

The prosecutor then proceeded to try the case on the theory that Petitioner's claim that the victim cut him with the butcher knife was false, and that he had actually cut himself with a smaller knife after stabbing the victim. (Docket Entry No. 66-3, at 36–38.) In her opening statement, she laid out the theory of the falsity of Petitioner's defense as follows:

> It's also very important, when you listen to the statement that he gave the police, to listen to what he says about the knife that was used. He says the only knife that's ever used in this altercation is this big butcher knife.

And you'll see it. It was there, it was left right next to her body, was collected by the police; it's tested by the TBI Lab. He says that's the knife that Sheila pulled on him and struck him with.

Well, you'll hear from the serologist, Agent Bash, his blood's not on that big, old butcher knife, Sheila's blood's on that butcher knife. His blood, come to find out, is on this little bitty old steak knife, that's in the kitchen.

When you hear the officers testify about the crime scene, take into consideration where these knives are located. Compare the evidence at the crime scene with what Mr. Robinson says in his statement to the police.

(Docket Entry No. 68-4, 7–8.) During trial, the prosecutor had the typewritten TBI report entered into evidence as Exhibit 24, and elicited the following testimony from TBI Agent Bash about the DNA testing conducted on the butcher knife:

Q.     Okay. And did you test that item for the presence of human blood?

A.     Yes, I did.

Q.     Okay. And what were the results of your testing on that item?

A.     I found human blood, and the DNA profile matched Sheila Matlock Calloway.

(Docket Entry No. 23-2, at 132, 144–45.) And finally, much of her final closing argument was devoted to highlighting evidence supporting the theory that Petitioner had inflicted his own wounds with a small steak knife,[6] and that his claim that the victim had attacked him with the

---

[6] The Third Amended Petition claims vaguely that "[t]he State also withheld from Robinson certain information regarding fingerprint testing done by the prosecution team prior to trial." (Docket Entry No. 53, at 30.) In his Motion for Summary Judgment, Petitioner expands upon this claim by asserting that the prosecution team lifted latent fingerprints from the steak knife, but were unable to match them to Petitioner because they did not have quality prints from him for comparison. (Docket Entry No. 70, at 49–50; Docket Entry No. 70-1, at 4–5.) Even assuming that Petitioner has sufficiently pled this claim, it is without merit. Petitioner has acknowledged having handled the steak knife to scrape the iron clean, *State v. Robinson*, No. M2002-00665-CCA-R3-CD, 2003 WL 21653882, at *9 (Tenn. Ct. Crim. App. July 11, 2003), so

butcher knife did not "make sense." (Docket Entry No. 68-4, at 48–51, 57–58.)

The prosecutor's theory was effective, and was clearly significant to the state court proceedings following Petitioner's conviction. In denying Petitioner's motion for new trial, the trial court relied in part on the fact that his testimony was "vastly" "inconsistent with what was found at the scene" with respect to blood evidence and which knife was involved. (Docket Entry No. 23-3, at 56.) Denying relief on direct appeal, the Tennessee Court of Criminal Appeals found sufficient evidence of premeditation based in part on its belief that "[a]lthough the Defendant claimed that the victim cut him with the same knife with which he stabbed her, only the victim's blood that [sic] was found on the knife." *State v. Robinson*, No. M2002-00665-CCA-R3-CD, 2003 WL 21653882, at *12 (Tenn. Ct. Crim. App. July 11, 2003).

During discovery permitted in the course of the present action, Petitioner for the first time was able to review the TBI documentation underlying the official report used at trial, and discovered that the only spot tested was near the handle far from the cutting edge. (Docket Entry No. 32, at 2.) Additional DNA testing authorized by this court has confirmed that Petitioner's blood *is* on the tip of the butcher knife on both sides, mixed with the victim's blood, and that it is in fact the "major contributor" of DNA on one side of the knife tip. (Docket Entry No. 34-1, at 6.)

---

the presence or absence of his prints on the knife would have little or no evidentiary value. Moreover, Petitioner offers no support for his assertion that latent prints that were inconclusively compared to Petitioner's prints would "tend to show that someone other than Robinson was the last person to touch the steak knife." Unidentified prints on an item of evidence that has undoubtedly been handled by people other than the perpetrator are not exculpatory. *United States v. Flores-Mireles*, 112 F.3d 337, 340 (8th Cir. 1997) (print was "neither inculpatory nor exculpatory" where "[t]here was no indication to whom the print belonged"); *Clarke v. Uribe*, No. CV 10-8128, 2014 WL 1055467, at *8 (C.D. Cal. March 19, 2014) ("[E]vidence of the unidentified print cannot be said to be exculpatory" because "a jury could have reasonably assumed that the murder weapon was likely handled by several people.").

Respondent argues that this claim is barred by the statute of limitations and that it is procedurally defaulted. (Docket Entry No. 58, at 8, 11; Docket Entry No. 82, at 9.) Respondent further argues that this claim does not establish a *Brady* violation because Petitioner could have discovered information about the nature and extent of the DNA testing at the time of trial, and because that evidence is neither exculpatory nor material. (Docket Entry No. 58, at 8–10; Docket Entry No. 82, at 10–12.)

### b. Law and Analysis

The statute of limitations on a *Brady* claim begins to run on the date the underlying facts are or could be discovered through due diligence, *Willis v. Jones*, 329 F. App'x 7, 16 (6th Cir. 2009), so claims based on facts that could not have been discovered until a habeas action is pending are not barred by the statute of limitations. Similarly, suppression of evidence that prevents a petitioner from raising claims arising from that evidence in state court can establish cause for the default of claims arising from that evidence. *Hutchison v. Bell*, 303 F.3d 720, 741 (6th Cir. 2002); *Smith v. Bell*, 381 F. App'x. 547, 552 (6th Cir. 2010), *vacated on other grounds sub nom. Smith v. Colson*, 132 S. Ct. 1790 (2012)). Because "the requirements for showing cause and prejudice parallel the elements of the underlying *Brady* violation," *Hutchison*, 303 F.3d at 741, if Petitioner is able to establish a *Brady* violation, he necessarily overcomes both the statute of limitations and procedural default bars. *Bies v. Sheldon*, 775 F.3d 386, 396 (6th Cir. 2014) (explaining that cause and prejudice parallel two components of a *Brady* claim "with the suppression of the evidence constituting cause and the materiality of the evidence resulting in prejudice").

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. The Supreme Court has articulated three components of a *Brady* violation: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

As noted above, Respondent contests whether evidence of the limited nature of the testing was "suppressed" for *Brady* purposes, which also goes to the statute of limitations issue and the cause prong of the procedural default analysis. The court finds that the evidence was suppressed. Respondent does not dispute that TBI Agent Bash, who was acting at the behest of the prosecution, was part of the prosecution team such that knowledge of her records of testing done on the butcher knife should be imputed to the prosecutor.[7] *See Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ("prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case"); *United States v. Meros*, 866 F.2d 1304, 1309 (11th Cir. 1989) (holding that prosecution team for *Brady* purposes includes investigators as well as

_____

[7] The court notes that the Sixth Circuit has rejected the argument that knowledge of TBI agents "with no connection or involvement in the investigation of [a] case" should be imputed to the prosecutor of that case for *Brady* purposes. *Sutton v. Carpenter*, – F. App'x –, No. 11-6180, 2015 WL 3853039, at *6–8 (6th Cir. June 23, 2015). This is not such a case. Agent Bash was personally and directly involved with the investigation and development of evidence used in Petitioner's prosecution, at the request and direction of the prosecutor and detective working the case.

prosecutors). In fact, he appears to have acknowledged that Agent Bash's knowledge was relevant to a *Brady* inquiry. (*See* Docket Entry No. 44) (arguing that initial discovery on the *Brady* claim should be limited to Agent Bash's deposition). Rather, Respondent's argument against a finding of suppression is that trial counsel could have learned the details of the testing procedure by asking Agent Bash about it prior to trial or by asking her during cross-examination at trial. (Docket Entry No. 58, at 9–9; Docket Entry No. 82, at 10.)

"There is no *Brady* violation 'where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available . . . from another source.'" *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998) (quoting *United States v. Clark*, 928 F.2d 733, 738 (6th Cir. 1991)). But where a petitioner justifiably relies on the state's representation that it does not have any exculpatory or impeaching evidence, due diligence does not require him to take further action to seek out evidence in the state's possession. *Willis*, 329 F. App'x at 16–17. That is precisely what happened in this case. Defense counsel was presented with the typewritten TBI report indicating that the blood on the butcher knife matched the victim. In response to his request for all evidence that might impeach or contradict any testimony by government witnesses, and for all TBI reports, counsel was told that nothing discoverable existed. It was not a failure of diligence to take the prosecution at its word, or to reach the same erroneous understanding that the prosecutor had – and presented to the jury – about the conclusive nature of the official TBI report. Indeed, it strains logic for Respondent to maintain that counsel's misapprehension arose from some lack of diligence on his part when it was shared by the prosecutor, the trial court

and the state appellate court.[8]  This conclusion is buttressed by the fact that Agent Bash would not have released her handwritten analysis documents or even discussed her analysis with defense counsel without first consulting with the prosecutor, and that even Agent Bash believed information about her analysis to be subject to the discovery process. (Docket Entry No. 67-1, at 72, 114–115.)

The court also finds that the evidence of the limited nature of the testing on the butcher knife was clearly favorable to the defense.  Evidence is favorable to a defendant when it impeaches the testimony of a key prosecution witness or undermines the prosecution's theory of the case. *Jamison v. Collins*, 291 F.3d 380 (6th Cir. 2002); *Bies*, 775 F.3d at 398.  The suppressed evidence in this case would have done both.  On cross-examination, the limitations of the DNA testing on the butcher knife would have minimized the impact of Agent Bash's official report and testimony about the knife and called into question the thoroughness of her analysis and value of her result, given that it was undisputed that the victim had been stabbed with the butcher knife.  It also would have undercut the prosecution's theory that Petitioner had to be lying about being attacked by the victim.

---

[8] The court finds it significant that of all the attorneys and judges to touch this case, only the prosecutor had reason to know of the limitations of the TBI testing of the butcher knife.  Specifically, she knew that the TBI generally tried to limit the extent of expensive DNA testing and would stop testing as soon as they found what they were looking for, and that she had not given the express instructions she knew were necessary to prompt the TBI to conduct the exhaustive testing required to determine whether the defendant's blood was present. (Docket Entry No. 66-3, at 22–24.)  Nevertheless, during her deposition in this action, the prosecutor continued to maintain that it was reasonable to construe the official TBI report to establish that Petitioner's DNA was not on the butcher knife. (*Id.* at 67.)

Respondent's primary argument against finding this evidence favorable to Petitioner is that the presence of Petitioner's blood on the tip of the butcher knife actually proves that he used the knife to cut himself after he stabbed the victim. (Docket Entry No. 82, at 11.) Specifically, Respondent asserts that "had he been stabbed by the tip of the murder knife prior to his using it to stab his fiancé, it is unlikely his blood would still be on it, particularly as the major contributor on one side of the tip." (*Id.*) This novel speculation is unsupported by any scientific evidence and contrary to the prosecution's argument at trial.[9] Moreover, the possibility that a piece of evidence might have a hypothetical weakness, or that the prosecution might have a response to it, does not change the favorable nature of the evidence.

The final *Brady* element is whether the suppressed evidence was material and its suppression prejudicial to Petitioner. There is no doubt that it was. "[E]vidence that directly undermines the prosecution's theory of the charged crime is 'plainly material' under *Brady*." *Comstock v. Humphries*, 786 F.3d 701, 713 (9th Cir. 2015). As discussed above, the erroneous construction of the TBI report as proof that Petitioner's blood was not on the butcher knife – which would have been disproved by the suppressed evidence – was one of the lynchpins of the prosecutor's premeditation theory at trial and was an important factor in the state court decisions that followed. This court, in ruling on the extent of discovery to be permitted, has already observed

---

[9] In addition, this theory might be undercut by the evidence of the negative result of the coomassie blue testing of the butcher knife, which, according to Petitioner, indicates that there are no bloody fingerprints on the knife. (Docket Entry No. 70, at 39; Docket Entry No. 116, at 10.) Any independent claim arising from the discovery of the coomassie blue test result is insufficiently developed or supported to merit relief, as Petitioner cites only the testimony of Agent Dash, who insisted that she is not a latent print examiner and could not tell whether anyone with bloody fingers had touched the knife, to explain the test. (Docket Entry No. 70, at 39; Docket Entry No. 67-1, at 108.) Nevertheless, it weighs against Respondent's own unsupported speculation.

that "[t]he testing of the blood on the knife's cutting edge used in the stabbing appears to be significant and material proof on a first degree murder charge." (Docket Entry No. 48, at 2.)  Disclosure of the true facts of the butcher knife testing would have rebutted or entirely prevented the prosecution's theory that Petitioner's statements and testimony about killing the victim in a sudden rage after she attacked him were false.  Moreover, that disclosure would likely have prompted the more thorough testing finally conducted during the course of this case, which establishes that Petitioner's blood *is* on the tip of the knife and corroborates his version of events.  Although the prosecutor might still have pointed to the Petitioner's blood on the steak knife and his failure to call 911 as the victim was dying in support of her case for premeditation, suppressed evidence need not undercut "every item of the State's case" in order to be material. *Bies*, 775 F.3d at 399 (quoting *Kyles*, 514 U.S. at 451).

Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) (internal quotation marks omitted).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) (internal quotation marks omitted).  Materiality for *Brady* purposes is a "difficult test to meet," and must be determined in light of the totality of the evidence, including the weight of the evidence of Petitioner's guilt. *See Montgomery v. Bobby*, 654 F.3d 668, 678 (6th Cir. 2011).  Nonetheless, to establish materiality, Petitioner need not demonstrate that disclosure of the suppressed evidence would have certainly or even more likely than not resulted in his acquittal. *Kyles*, 514 U.S. at 434.

While it is undisputed that Petitioner killed the victim, the evidence of premeditation needed to support his conviction for first-degree premeditated murder was far from overwhelming. Respondent argues that evidence of his blood on the knife is not material because it would have been redundant to the evidence admitted at trial about the cuts on his arms. (Docket Entry No. 82, at 12.) Respondent would have the court disregard the likelihood that the jury convicted Petitioner of first-degree premeditated murder because it accepted the prosecutor's theory – based largely on an inaccurate and misleading representation of the blood evidence – that Petitioner's version of events was fabricated and that the victim had not attacked him with the butcher knife. Given the obvious significance, as indicated above, of the butcher-knife-blood evidence to the prosecution, the trial court and the state court of appeals, the court finds that it was reasonably likely to have had a similar impact on the jury. There is thus at least a reasonable probability that disclosure of the fact that the presence of Petitioner's blood on the butcher knife had ***not*** been ruled out – particularly if it had prompted the further testing that establishes that his blood ***was*** on the knife – would have altered the outcome of Petitioner's trial.

Petitioner has established cause and prejudice to overcome the default of this claim, and has satisfied the elements of a *Brady* claim on the merits. Petitioner is therefore entitled to relief on Claim 2.

### 2. Claim 3(a), (b) and (g) – Ineffective Assistance of Trial Counsel

As an alternative to his *Brady* claim, Petitioner asserts that – if the court determines that trial counsel failed to discover the evidence relevant to the *Brady* claim through a lack of diligence – trial counsel provided ineffective assistance in that regard.

Specifically, Petitioner asserts that counsel was ineffective in failing to independently investigate and test the scientific evidence and TBI results and in failing to challenge and object to the prosecutor's improper presentation and argument related to that evidence.

Claims of ineffective assistance of counsel are subject to the highly deferential two-prong standard of *Strickland v. Washington*, 466 U.S. 668 (1984), which asks: (1) whether counsel was deficient in representing the defendant; and (2) whether counsel's alleged deficiency prejudiced the defense so as to deprive the defendant of a fair trial. *Id.* at 687. To meet the first prong, a petitioner must establish that his attorney's representation "fell below an objective standard of reasonableness." *Id.* at 688. Mere attorney ignorance or inadvertence will not constitute "cause" unless the error rises to the level of a constitutional violation. *See Coleman*, 501 U.S. at 752–55. The "prejudice" component of the claim "focuses on the question of whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

In assessing counsel's performance, a reviewing court must be highly deferential and avoid the "second-guess[ing of] counsel's assistance . . . , [as] it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689. The court must determine whether, under the circumstances, counsel's allegedly unreasonable acts or omissions "were outside the wide range of professionally competent assistance." *Id.* at 690. In order to avoid "the distorting effects of hindsight," a reviewing "court must indulge a strong presumption that counsel's conduct falls within

the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that . . . the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (citation omitted).

Prejudice, under *Strickland*, requires showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* The Supreme Court has further explained the *Strickland* prejudice requirement as follows:

> In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, *Strickland* asks whether it is "reasonably likely" the result would have been different. This does not require a showing that counsel's actions "more likely than not altered the outcome," but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters "only in the rarest case." The likelihood of a different result must be substantial, not just conceivable.

*Harrington v. Richter*, 562 U.S. 86, 111–12 (2011) (internal citations omitted).

For the reasons set forth above in connection with Claim 2, the absence at trial of the evidence of the TBI testing limitations, and the evidence that Petitioner's blood was actually on the butcher knife, was clearly prejudicial to Petitioner. Nevertheless, this claim fails at the first prong. The court has already determined that defense counsel did not exhibit a failure of diligence with respect to the scientific evidence, and his representation therefore did not fall below an objective standard of reasonableness. Defense counsel's apparent assumption that the TBI report established conclusively that Petitioner's blood was not on the butcher knife was incorrect, but without the underlying information about the limitations of the testing, which he had no reason to

suspect, the assumption was not objectively unreasonable. Accordingly, Petitioner is not entitled to relief on this claim.

### 3. Claim 5 – Misleading Argument by Prosecutor

Finally, Petitioner asserts that the prosecutor's misleading and inaccurate use of the TBI report at trial constituted a violation of his right to due process.

The United States Supreme Court has stated that prosecutors must "refrain from improper methods calculated to produce a wrongful conviction." *Berger v. United States*, 295 U.S. 78, 88 (1935). But the standard for granting habeas corpus relief on the basis of improper prosecutorial argument is extremely high. "The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citations and internal quotation marks omitted) (denying relief on the basis of inflammatory prosecutorial argument). This is particularly true when a federal court reviews a case on habeas corpus, where the scope of review is "the narrow one of due process, and not the broad exercise of supervisory power." *Id.* (quoting *Donnelly v. DeChristophoro*, 416 U.S. 637, 642 (1974)). To require reversal, a prosecutor's misconduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial or so gross as probably to prejudice the defendant." *Bates v. Bell*, 402 F.3d 635, 641 (6th Cir. 2005) (quoting *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997)).

The Sixth Circuit has instructed that in order to obtain relief on a claim of prosecutorial misconduct, a petitioner "must demonstrate that the prosecution's conduct was both improper and so flagrant as to warrant reversal." *Id.* Accordingly, if a court

first finds improper conduct, it must then consider four factors to determine whether the challenged conduct is flagrant: "(1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the petitioner; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant." *Id.* Finally, in order to determine whether prosecutorial misconduct warrants a writ of habeas corpus, courts must find the error to be harmless unless it "had a substantial and injurious effect or influence in determining the jury's verdict." *Id.* (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)); *accord Moore v. Mitchell*, 708 F.3d 760, 799–800 (6th Cir. 2013).

Respondent argues that this claim is barred by the statute of limitations and procedural default. As discussed above, however, the facts giving rise to this claim were suppressed and not reasonably discovered by Petitioner until after this action was originally filed. Accordingly, the claim is timely, and Petitioner has established cause for his failure to raise the claim during state proceedings.

The remainder of Respondent's defense to this claim amounts to an argument that the prosecutor's misrepresentation of the serology evidence with respect to the butcher knife was not "knowingly false." (Docket Entry No. 82, at 16.) Essentially, Respondent's position is that the prosecutor – who knew that she had not given the specific instructions to the TBI that would be necessary to conclusively determine the presence of a defendant's blood on the evidence – simply failed to grasp the critical distinction between a finding that the victim's blood **was** on the knife and a finding that

Petitioner's blood **was not** on the knife,[10] and based her theory of the case on that misunderstanding. Even assuming this is truly an instance of innocent mistake, Respondent does not cite any law supporting his position that such an egregious mistake cannot amount to a constitutional violation.

Misstatement of the evidence in a criminal trial by a prosecutor is clearly improper. *See Macias v. Makowski*, 291 F.3d 447, 452 (6th Cir. 2002). While the prosecutor's state of mind with regard to the misstatement is one factor in whether the impropriety was sufficiently flagrant to warrant relief, it can be outweighed by the three other factors. In this case, the prosecutor's mischaracterization of the serology evidence was far from isolated – it was her theory of the case and was carried from opening statements through closing argument. She relied on the alleged absence of Petitioner's blood on the butcher knife as proof that the victim had not attacked him with the knife, and that the Petitioner was therefore a liar whose account of the events could not be trusted. The other evidence of premeditation was far from clear-cut. And the prosecutor's presentation almost certainly misled the jury, as it misled both the trial court and the appellate court reviewing the case. This error was not harmless, but went to the key issues of the circumstances leading up to the defendant's death and the credibility of Petitioner's version of events. Where the prosecutor wrongly construed key evidence in a way that possibly impacted the outcome of the case, the fact that she had inexplicably failed to inquire into and correctly understand her own evidence is not a basis for denying relief. *See United States v. Forlorma*, 94 F.3d 91, 94 (2d Cir. 1996)

---

[10] Respondent's characterization of that distinction as "technical details of the report" (Docket Entry No. 82, at 16) does not do justice to its significance.

(granting relief where prosecutor repeatedly mischaracterized evidence even though he "may have been unaware" that he was incorrect).

Upon consideration of all of the relevant factors, the court finds that the prosecutor's inaccurate characterization of the serology evidence was flagrantly improper, and that the resulting prejudice to Petitioner supports the claim and is sufficient to overcome the bar of procedural default. Petitioner is entitled to relief on this claim.

## VI.    MOTION TO EXPAND THE RECORD

Having previously been allowed to expand the record once (*see* Docket Entry No. 37), Petitioner has moved the court to further expand the record to include twelve pieces of evidence. (Docket Entry Nos. 66–68 and 74.)   Respondent opposes the motion only with respect to three of the new pieces of evidence: Docket Entry Nos. 66-2 (ABA standards), 68-1 (affidavit of trial counsel) and 68-6 (second expert report). (Docket Entry No. 81.)   In reply, Petitioner has withdrawn his motion with regard to Docket Entry No. 66-2 (ABA standards).

Petitioner's motion (Docket Entry No. 74) will be granted in part, and the record will be expanded to include the new evidence to the extent that it is uncontested. Because the court has not relied on the three contested pieces of evidence in reaching its decision in this case, the motion will be denied as moot with respect to those documents.

**VII.    CONCLUSION**

For the reasons set forth above, Petitioner's Motion to Expand the Record (Docket Entry No. 74) will be granted in part and denied in part.  Petitioner's Motion for Summary Judgment (Docket Entry No. 70) will be granted with respect to Claims 2 and 5, and a conditional writ of habeas corpus will issue on those claims.  With respect to claims 1, 3, 4, 6 and 7, Petitioner's Motion for Summary Judgment (Docket Entry No. 70) will be denied, and Respondent's Motion for Summary Judgment (Docket Entry No. 87) will be granted.

An appropriate order shall enter.

_____
Kevin H. Sharp, Chief Judge
United States District Court